UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

3:22MJ470(TOF)

STATE OF CONNECTICUT　　　　:　　ss: Hartford, Connecticut
　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　:
COUNTY OF HARTFORD　　　　　:　　May 4, 2022


**MASTER AFFIDAVIT IN SUPPORT OF:**
**(1) CRIMINAL COMPLAINTS AND ARREST WARRANTS, AND**
**<u>(2) SEARCH WARRANTS FOR PREMISES</u>**

　　　　I, Kimberly Ladyga, a Special Agent of the Drug Enforcement Administration (DEA),

being duly sworn, hereby depose and state the following:

## I.　<u>INTRODUCTION AND AFFIANT BACKGROUND</u>

　　　　1.　　　　I have been a member of the Drug Enforcement Administration since 2019.  From

January 2020, to the present I have been assigned to the DEA's Hartford Resident Office

("HRO") as a Special Agent (SA).  Before joining the DEA, I served over fourteen years as a

Police Officer with the Arlington County Police Department in Arlington, Virginia, and the

Meriden Police Department, in Meriden, Connecticut.  I have a master's degree in Forensic

Psychology and have completed the Basic Agent Training Program for DEA conducted in

Quantico, Virginia.  I have received specialized training in narcotics identification and the

investigation of narcotics-related offenses. I have received instruction on conducting drug

investigations while attending the DEA Academy in Quantico, Virginia. I also receive periodic

in-service training on conducting drug investigations.

　　　　2.　　　　During the course of my career, I have participated in numerous criminal

investigations, including many investigations into suspected narcotics trafficking, money

laundering and violations of firearms laws.  My participation in the investigations has included:

1

coordinating controlled purchases of narcotics using confidential informants, cooperating witnesses, and undercover law enforcement officers; coordinating the execution of search and arrest warrants, many of which have resulted in the seizure of narcotics, firearms and drug paraphernalia used in narcotics distribution; conducting electronic and physical surveillance, including the conduct of wiretap investigations; analyzing records related to narcotics trafficking; testifying in court proceedings; and interviewing informants and cooperating witnesses, many of whom are involved in drug distribution activity, and other members of law enforcement regarding the manner in which narcotics traffickers obtain, finance, store, manufacture, transport, and distribute controlled substances.  I have participated in several investigations involving the use of court-authorized interception of wire and electronic communications, including text messages, as a co-case agent.  My participation included monitoring the intercepted communications, surveillance related to intercepted communications, and executing search and arrest warrants resulting from the intercepted communications and testimony in court proceedings

3.      I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), in that I am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516, offenses set forth in Title 21, United States Code and other federal felony offenses.  I am also a "federal law enforcement officer" within the meaning of the Federal Rules of Criminal Procedure 41(a)(2)(C), that is, a government agent authorized to enforcement criminal laws and duly authorized by the Attorney General to request a search warrant.

## II. **<u>REQUESTED WARRANTS & CRIMINAL COMPLAINTS</u>**

4.      This affidavit is first submitted in support of criminal complaints and arrest warrants for the following individuals:

      a.      **Sergio HORTA-MOLINA** (b. 1975), and

      b.      **Octavio RAZON-MEJIA, a.k.a "Pachas"** (b. 1986), and

      c.      **Carlos GUTIERREZ-FERNANDEZ, a.k.a. "Shaggy"** (b. 1984),

charging them with conspiracy to distribute a controlled substance, in violation of 21 U.S.C. §§ 846 and 841(a)(1), and possession with intent to distribute and distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1).

5.      This affidavit is also submitted in support of applications for search warrants for the following premises:

**(a)      Target Premises #1 – Any sheds, chicken coops, outbuildings and the garage located at 278 East Street North, Suffield, CT** – which is the residential address of **Sergio HORTA-MOLINA**.  The dwelling is a yellow colored, single family residence.  The numerals "278" are clearly displayed on the black aluminum fence that surrounds the home, as well as, on the front porch post.  The front door of the residence faces west onto East Street North and the driveway of the residence is on the south side of the structure.  Precision location data on **Target Telephone 3**, in conjunction with physical surveillance, has consistently placed **HORTA-MOLINA** at this address, which is registered in the name of **HORTA-MOLINA's** spouse, Brittainy Molina.

**(b)      Target Premises #2 – 17 Russell St., Enfield, CT** is a residential address where multiple members of the alleged drug trafficking enterprise have been surveilled and is the suspected residence of Juan Sanchez-Razon.  The dwelling is a multi-family residence, tan with white trim, located on the west side of Russell St.  The front entrance is on the east side of the

building.  The number "17" is clearly displayed on the front portico.  Interceptions over **Target Telephone 2**, in conjunction with physical surveillance has revealed that this is a suspected stash house for the drug trafficking enterprise.

      **(c)**      **Target Premises #3 – 22H Pleasant St., Enfield, CT** – is the residential address of **Octavio RAZON-MEJIA**.  The dwelling is a multi-family complex that is greyish tan in color.  The numerals "22h" are clearly affixed to the front (west) side of the building, adjacent to an outside stairwell, which leads to the second floor, where apartment 22H is located.  Precision location data on **Target Telephone 2**, in conjunction with numerous instances of physical surveillance have revealed that **RAZON-MEJIA** resides at this address.

      6.      I am one of the case agents who directed this investigation.  As a case agent, I am intimately familiar with the facts and circumstances of this investigation.  I was personally involved in the majority of the investigative activities undertaken during this investigation.  The facts set forth herein are based on, *inter alia*, my personal knowledge and participation in this investigation, information provided to me and other investigators by a confidential source, my review of court-authorized interceptions of wire and electronic communications, consensually monitored phone communications, arrests and interviews of members or associates of this drug trafficking organization (DTO), information that I obtained from public records, law enforcement databases and other reliable sources, information provided to me by other law enforcement officers, my analysis of police and investigative reports, and other information which I have reviewed and determined to be accurate and reliable.  Because this affidavit is submitted for a limited purpose, I have not included each and every fact I know about this investigation.  I have set forth only those facts necessary to establish probable cause for the requested criminal complaints, arrest warrants and search warrants.

### III.  RELEVANT FACTS

7.      Since October of 2021, the DEA HRO has been investigating a large-scale drug trafficking organization (DTO) that is distributing kilogram quantities of cocaine in Connecticut. During this investigation, investigators have utilized numerous investigative techniques to develop information regarding the DTO and its members, including, *inter alia¸* the following: controlled purchases of narcotics from members of this DTO; physical and electronic surveillance; consensually monitored and recorded phone calls with members of this DTO; court-authorized interceptions of phone calls and electronic communications (including text messages) over cell phones used by members of this DTO; warrants and orders-authorizing the use of pen registers, E-911 data, cell site simulators and GPS devices; seizures of narcotics from members of this DTO; and arrests of members and associates of this DTO.  As a result, investigators have developed substantial evidence of the existence of the DTO and the actions of its members.   This evidence has established the following:

### IV.      OVERVIEW OF THE HORTA-MOLINA DTO.

8.      There is a DTO operating in the area of Enfield, CT that is believed to have to ties to a Mexican drug cartel known as, Jalisco New Generation Cartel ("CJNG"), which is involved in the transport and distribution of multi-kilogram quantities of cocaine, as well as heroin and fentanyl.  **Sergio HORTA-MOLINA** has been identified as one of the leaders of the DTO. **HORTA-MOLINA** arranges for large quantities of narcotics (specifically, Cocaine) to be brought and/or shipped to the State of Connecticut and then provided to members of the DTO in Connecticut who, in turn, distribute the narcotics to lower-level traffickers in Connecticut and surrounding areas.  Numerous members of the enterprise have been identified and law enforcement is continuing to investigate their relative roles in the DTO.

5

As it relates specifically to this application, **Octavio RAZON-MEJIA** and **Carlos GUTTIEREZ-FERNANDEZ** have been identified as members of the DTO who live in Connecticut and conduct narcotics trafficking activities on behalf of and in conjunction with **HORTA-MOLINA**.  During this investigation, **RAZON-MEJIA** and **GUTIERREZ-FERNANDEZ** have distributed or delivered narcotics on behalf of **HORTA-MOLINA**.

## V.      EVIDENCE REGARDING HORTA-MOLINA

### A.      Background Information: HORTA MOLINA's Criminal History.

8.      In October of 2021, CS-1 initially began providing information about the DTO and identified some its members.  CS-1 informed investigators that **Guillermo CAPETILLO-CERVANTES** was distributing cocaine and heroin in the greater Hartford area and identified HORTA-MOLINA as a leader in the group.  CS-1 believed that **HORTA-MOLINA** was trying to keep a low profile due to his prior conviction for narcotics-trafficking and had given a lot of responsibility to **Octavio RAZON-MEJIA**.   Investigators attempted to verify CS-1's information and found that in September of 2017, **HORTA-MOLINA** was arrested at his home in Suffield (**Target Premises #1 – 278 East Street North, Suffield, CT**) by DEA Bridgeport, FBI New Haven and the Danbury Police Department and was found to be in possession of 23 kilograms of cocaine and 1 kilogram of heroin.  The arrest stemmed from an FBI investigation out of the District of New Jersey into a multi-state conspiracy to distribute cocaine and heroin from Mexico to the Northeast.  HORTA-MOLINA was convicted of Conspiracy to Distribute Narcotics was sentenced to a period of incarceration and remain of federal supervised release.  His maximum release date from federal supervision is July 21, 2025.

B.    **Court Authorized Wiretaps.**

9.    On three occasions during this investigation, the affiant sought court-authorized interception of telephone calls and electronic communications (which include text messages) over the following three cellular phones: (1) cellular phone 860-394-7150 ("**Target Telephone 1**"), which was used by **Guillermo CAPETILLO-CERVANTES**; (2) cellular phone 860-597-6306 ("**Target Telephone 2**"), which was used by **Octavio RAZON-MEJIA** and, (3) cellular phone 860-713-8030 ("**Target Telephone 3**"), which was used by **Sergio HORTA-MOLINA**.[1] Each of the applications was reviewed and approved by U.S. District Court Judge Omar A. Williams.

10.    Intercepted communications confirmed that **CAPETILLO-CERVANTES**, **RAZON-MEJIA** and **HORTA-MOLINA** all are members of the DTO, and that **HORTA-MOLINA** is a leader of this DTO.  Intercepted communications revealed, among other things, that **CAPETILLO-CERVANTES** is distributing narcotics in the Enfield, CT area and that he relies, in large part on **RAZON-MEJIA** for his supply of narcotics.  Likewise, intercepted communications have revealed that **RAZON-MEJIA** is engaged in the distribution of narcotics in the areas of Enfield, CT and Springfield, MA and that he relies on **HORTA-MOLINA** for his supply of narcotics.   Investigators intercepted numerous communications during which **HORTA-MOLINA**, **RAZON-MEJIA** and others discussed and arranged narcotics transactions. Intercepted communications also revealed that **HORTA-MOLINA** and **GUTIERREZ-**

---

[1]  Investigators intercepted communications over **Target Telephone 1** between approximately January 25, 2022, and February 24, 2022, over **Target Telephone 2** between approximately March 15, 2022, and April 14, 2022, and over **Target Telephone 3** between approximately April 20, 2022, to Present.

**FERNANDEZ** arranged the transportation of a kilo of cocaine that was sent to **HORTA-MOLINA** through the mail.

### VI.   EVIDENCE REGARDING HORTA-MOLINA

11.     As discussed herein, **Sergio HORTA-MOLINA** is a member of the DTO, who distributed cocaine and fentanyl in and around Connecticut to narcotics traffickers such as **RAZON-MEJIA** on behalf of the DTO.  Based on a review of approximately five months of toll records investigators were aware that **HORTA-MOLINA** and **RAZON-MEJIA** were in contact via cellular telephone and that the calls tended to follow a particular pattern, that is the contacts would be spaced out by three to four weeks. Based on this pattern, along with evidence to be included herein, investigators believe that **RAZON-MEJIA** was going to **HORTA-MOLINA** for his supply of narcotics.

### A.   Intercepted Communications on 3/19/2022

12.     During communications between **RAZON-MEJIA** and **HORTA-MOLINA** on March 19, 2022 (session 85), **HORTA-MOLINA** asked **RAZON-MEJIA**, while referring to a prior conversation, if **RAZON-MEJIA** had asked him for "the other shit" or "that?"   **RAZON-MEJIA** advised that he had asked "for the other," but that **HORTA-MOLINA** never brought him anything.   **HORTA-MOLINA** then apologized saying, "Oh fuck! I forgot. Because I just opened one, Pacha . . . I'm sorry man."   **HORTA-MOLINA** then stated, "I'm here at home dude."   To which, **RAZON-MEJIA** responded, "Can you pass by here?  Bring me one?"   **HORTA-MOLINA** explained that he could not leave the house because he was with his child but invited **RAZON-MEJIA** to come to him and gave a description of the home.   **HORTA-MOLINA** also indicated that his wife was not home so it was okay for **RAZON-MEJIA** to come to the house.   **RAZON-MEJIA** responded that he would be over soon.

13.     Surveillance efforts were immediately mobilized following the intercepted communications and investigators observed **RAZON-MEJIA** drive directly to **HORTA-MOLINA's** residence, where he met briefly with **HORTA-MOLINA** in the driveway (never leaving his vehicle) and then left shortly thereafter.  Officers were able to see **HORTA-MOLINA** come directly from his home at 278 East Street N., Suffield (**Target Premises #1**) reach into the driver's window but were not in a position to see what was passed.  Surveillance continued to follow **RAZON-MEJIA** and saw him meet up with an unknown party to make a drug sale.  There were corresponding communications that were intercepted, where the buyer had reached out to **RAZON-MEJIA** and the parties arranged to meet at the location where the sale was surveilled (session 86).

### B.     Meeting on April 16-17, 2022

14.     On April 17, 2022, while there was no court authorized wiretap in process, agents reviewed toll records and determined that **HORTA-MOLINA** and **RAZON-MOLINA** were in contact on April 16th and 17th.  This was approximately one month since **RAZON-MEJIA** was seen meeting with **HORTA-MOLINA** in the driveway of **Target Premises #1** and was the first contact between the parties since that date.  Investigators reviewed pole camera footage of 22H Pleasant Street, Enfield, CT and found that on April 16, 2022, a Honda SUV, which had previously been seen parked in **HORTA-MOLINA**'s driveway at Target Premises #1 traveled onto Pleasant Street and parked around the corner from **RAZON-MEJIA's** apartment on Chapel Street.  At that time the toll records showed that **HORTA-MOLINA** called **RAZON-MEJIA**.  Two minutes later, **RAZON-MEJIA** was seen exiting the stairway to his apartment and walking in the direction that the Honda SUV parked.  Ten minutes later **RAZON-MEJIA** returned to his apartment.  Pole camera footage at **Target Premises #1** showed that the Honda SUV returned home approximately one hour later.

15.     The following day on April 17, 2022, at approximately 11:21 a.m., the pole camera at **Target Premises #1** showed an adult male, matching **HORTA-MOLINA's** appearance, exit the home which **HORTA-MOLINA** shares with his wife and children, and drive away in a Nissan pickup truck which **HORTA-MOLINA** had also previously been seen driving on multiple occasions.  Approximately four minutes later, Pole cameras outside 22 Pleasant Street picked up the vehicle driving onto Pleasant Street and parking by the curbside.  Two minutes later, **RAZON-MEJIA** is seen coming out of the stairwell that leads exclusively to his apartment and get into the pickup truck.  Approximately thirty (30) seconds later, **RAZON-MEJIA** exited the pickup truck, walks back up to his apartment and the pickup truck left the area.  It should be noted that **RAZON-MEJIA** was wearing a jacket and when he exited the vehicle he had both hands in his pockets in a manner that appeared to investigators that he was attempting to conceal an item.

**C.     Seizure of a kilogram of cocaine on April 27, 2022.**

16.     On April 27, 2022, members of the DEA HRO and the Enfield Police Department conducted surveillance on an individual identified as "Shaggy" based on information gathered from intercepted calls on the court authorized Title III of **Target Telephone 3** (860-713-8030), a phone utilized by **Sergio HORTA-MOLINA**.  "Shaggy," utilizing cellular telephone number 860-513-8163 was in frequent communication with HORTA-MOLINA.  "Shaggy" was later identified by a Mexican passport as **Carlos GUTIERREZ-FERNANDEZ**.

17.     The pertinent calls intercepted over TT3 between **HORTA-MOLINA** and **GUTIERREZ-FERNANDEZ** occurred on April 26, 2022.  In summary, in one of the calls **HORTA-MOLINA** tells "Shaggy" to meet "Juanito" (believed to be **Juan SANCHEZ RAZON**) the following day (4/27/22) before 7: 00 a.m. and that "Juanito" has something at his house to give to "Shaggy." (It should be noted that **Juan SANCHEZ RAZON** resides at 17

Russell Street, Enfield.)  Knowing that **GUTIERREZ-FERNANDEZ** would be meeting

"Juanito" before work, **HORTA-MOLINA** directed **GUTIERREZ-FERNANDEZ**, to place the

item from "Juanito" in the "small room" at his place of employment (the "small room" had

previously been referenced on calls as a utility area located at Molina's Plaza, a commercial

space in Enfield) and then when he was able to leave work to bring the item to **HORTA-**

**MOLINA**'s home and put it in a particular location "with the tools."  **GUTIERREZ-**

**FERNANDEZ** repeated the instructions, confirming that he would put the item from "Juanito"

in his backpack and then take  it to **HORTA-MOLINA's** house.  To which, **HORTA-**

**MOLINA** replied, "Yes."

      18.     On April 27, 2022, at approximately 5:25 a.m. members of the DEA HRO and the

Enfield Police Department conducted surveillance on **GUTIERREZ-FERNANDEZ** and on

locations identified through the course of the investigation as locations that are connected to the

DTO.  5 Northwood Street, Enfield and 12 Martin Street, Enfield were physically surveilled,

while officers monitored surveillance camera feeds at 17 Russell Street, Enfield, 22H Pleasant

Street, Enfield and **HORTA MOLINA**'s residence at 278 East St. North, Suffield, CT.

      19.     At approximately 6:35 a.m. SA Novotny observed a Hispanic male walking away

from 5 Northwood St, where "Shaggy" was believed to reside.  The Hispanic male (believed to

be "Shaggy") was wearing grey sweatpants, a black hoodie, a green ball cap and was carrying a

gray backpack.  The male walked in the direction of Molina's Plaza located at 95 High St., which

is a few blocks away.  A surveillance team followed the male through the side streets toward

Molina's Plaza and maintained visual contact for the entire route.

      20.     At approximately 6:40 a.m. Enfield Police Officer Prior observed, via the

surveillance camera outside 17 Russell St., that a male exited the residence and got into a black

Dodge Nitro bearing Connecticut registration BA20189, which has previously been identified by agents.  The vehicle is registered to **Octavio RAZON-MEJIA** at 17 Russell Street Enfield, CT.  However, investigators know through surveillance that **RAZON-MEJIA** does not operate this vehicle.  The person believed to operate the Nitro is **Juan SANCHEZ-RAZON** who lives at 17 Russell Street and has been called/addressed as "Juanito" in previous calls intercepted over Target Telephone 2 (specifically, session 524).  The Nitro left Russell Street, turned right onto North Main Street and moments later was seen by TFO Kowalczyk "slow rolling" down Central St. in front of Molina's Plaza to the intersection of Central St. and North Main St. **(**Officer Prior was able to utilize street cameras to see that the Nitro came from 17 Russell St onto North Main Street, then seconds later turned onto High Street then turned onto Central Street. There are no cameras on Central Street, but TFO Kowalczyk was physically in position to see the Nitro roll down Central Street.)

21.     At approximately 6:45 a.m. TFO Kowalczyk observed the male, believed to be "Shaggy," who was walking and carrying the backpack, get into the passenger side front seat of the Nitro and the Nitro drove away.  The surveillance team was able to observe the Nitro loop the block, pull into Molina's Plaza, and park in the parking lot.  This meet up appeared to be consistent with the intercepted communication where **HORTA-MOLINA** directed "Shaggy" to meet "Juanito" in the morning to get what "Juanito" had at the house.

22.     At approximately 6:47 a.m., SA Hanson observed the male ("Shaggy") get out of the Nitro with the gray backpack and enter a door, which was part of the commercial building located at Molina's Plaza, this door is believed to be the small room/utility room as described in TT3 intercepts from the previous day.   This movement was consistent with what HORTA-MOLINA had told "Shaggy" what to do with "it" after he took custody from "Juanito," that is to

12

place it in the "small room."  After "Shaggy" exited the vehicle, the Dodge Nitro exited the

parking lot, where it was followed to 111 Phoenix Avenue and parked in the rear parking lot.

      23.     At approximately 7:42 a.m., there was an intercepted call between **HORTA-**

**MOLINA** and "Shaggy" (session 120).  In summary, on the call **HORTA-MOLINA** asked

"Shaggy" if everything was good.  "Shaggy" assured him that everything was good and that he

("Shaggy") has already put "it" in his backpack.  "Shaggy" told **HORTA-MOLINA** that he

("Shaggy") will take a bicycle and go slow.  **HORTA-MOLINA** replied "ok," and advised

"Shaggy" not to open the front door because "his woman" (**HORTA-MOLINA's** wife) is home.

**HORTA-MOLINA** directed "Shaggy" to go to the back of the house where the chickens are

located and put "it" where the chicken food is kept.  "Shaggy" reassured **HORTA-MOLINA**

that it would be done.

      24.     At approximately 11:07 a.m., DEA TFO Chamberland, who is also an officer with

Enfield Police Department Officer, observed "Shaggy" riding a bicycle on High Street, while

wearing a backpack.  TFO Chamberland then observed "Shaggy" fail to stop at a stop sign and

fail to provide any hand signal when he turned left at the intersection of High Street and Pearl

Street, which is a four-way stop.   TFO Chamberland notified Officer Prior via phone regarding

the traffic violations.  TFO Chamberland followed as "Shaggy" rode his bicycle south on Pearl

Street and observed "Shaggy" then cut in front of TFO Baidy's vehicle causing TFO Baidy to

have to apply the brakes in order to avoid a collision.  Officer Prior was also made aware of that

observation.

      25.     At approximately 11:10 a.m., Officer Prior stopped "Shaggy" for the said

violations.  Shortly thereafter, Officer Bartolucci joined the stop to assist Officer Prior.  Officer

Prior advised that while investigating, he asked "Shaggy" for his identification.  "Shaggy"

opened the backpack to get identification and provided a Mexican passport in the name of **Carlos GUTIERREZ-FERNANDEZ**. When **GUTIERREZ-FERNANDEZ** opened the backpack to get the passport, Officer Prior observed in plain view what he believed through his training and experience to be packaged narcotics. He observed a large brick-like shape that was wrapped and placed in a CVS bag. The shape was consistent with that of a pressed kilogram of narcotics. Additionally, Officer Bartolucci, who is a K-9 officer, deployed his narcotic detection K-9, Britford, who alerted to the suspected kilo of narcotics.

26.     Officer Prior then seized the suspected kilogram of narcotics and brought it to the Enfield Police Department, where it was further photographed and examined. Photographs were taken as each layer was removed, which included plastic wrap, carbon paper and a thin rubber material, before eventually revealing a compressed brick-like form of a white powder substance. The aggregate weight of the suspected narcotic and its wrapping was 1.192 kilograms. A small portion of the suspected narcotics was subject to field testing for the presence of cocaine and fentanyl using the respective field test kits. A presumptive positive result for cocaine was observed along with a presumptive positive result for the presence of fentanyl. Field tests for both cocaine and fentanyl were administered in this case because through the training and experience of the agents and officers present, there has been a recent pattern of quantities of seized drugs containing a mixture of both cocaine and fentanyl. Stamped into the brick-like form of the powder cocaine/fentanyl was the "Bitcoin" symbol (the letter B with a line through it) and the number "7" in two locations. On the outer wrapping used to package the material was a label on one side and the other side had the number 7 and words "MARCA," "BIT," "PESO," and "LOTE." Below the word "PESO" was the number 1003. This type of packaging and stamping is consistent with how Mexican drug cartels mark and track their products.

14

27.     At approximately 3:15 p.m., after being released from custody by the Enfield Police Department, **GUTIERREZ-FERNANDEZ** contacted **HORTA-MOLINA** and the call was intercepted (session 124).  During the call, **GUTIERREZ-FERNANDEZ** advised **HORTA-MOLINA** that he was stopped by police and that they "found everything." **GUTIERREZ-FERNANDEZ** promised **HORTA-MOLINA** that he did not tell the police anything and that he will pay **HORTA-MOLINA** back for the product which was lost. **HORTA-MOLINA** advised **GUTIERREZ-FERNANDEZ** not to worry and instructed him not to tell anyone about the incident.

### C.   Intercepted communications with Juan ANDRADE-GUZMAN

28.     Additionally, investigators intercepted other calls from **HORTA-MOLINA** which revealed discussion about narcotics trafficking.  On or about April 29, 2022, at approximately 3:00 p.m., **HORTA-MOLINA** placed a call to Juan ANDRADE-GUZMAN (session 164), where is tells ANDRADE-GUZMAN that he is returning his call, as he saw that ANDRADE-GUZMAN had called numerous times the day prior.  ANDRADE-GUZMAN stated that he was looking for "good action" and knew that **HORTA-MOLINA** would have something. **HORTA-MOLINA** asked why he did not go to "Pachas" (nickname of **Octavio RAZON-MEJIA**), and ANDRADE-GUZMAN states that "Pachas" only has "a few things," and the buyer that ANDRADE-GUZMAN as looking to sell to wanted a "half."  **HORTA-MOLINA** asked ANDRADE-GUZMAN who will be responsible for the "kilo" (Investigators believe **HORTA-MOLINA** is referring to the transportation of the kilo).  ANDRADE-GUZMAN agrees that he does not want the responsibility but mentions that someone named "Omar" makes deliveries in a borrowed truck, and he may be willing to do it.  Later in the day (in session 187), ANDRADE-GUZMAN places a call to **HORTA-MOLINA**.  In summary, ANDRADE-

15

GUZMAN advises **HORTA-MOLINA** that he will be arriving at **HORTA-MOLINA's** home

shortly.  **HORTA-MOLINA** stated that this was fine, but that his wife was home and he did not

want her to see him.  ANDRADE-GUZMAN acknowledged and stated that everything is all "set

with that shit."  He advised **HORTA-MOLINA** that he will go out back with the chickens and

be gone in 10-15 minutes with "Sabino" (believed to be Sabino RAZON, who is another close

associate of **HORTA-MOLINA**).  It should be noted that the previously intercepted

communication between **GUTIERREZ-FERNANDEZ** and **HORTA-MOLINA** indicated that

the chicken coop is where the kilogram seized from **GUTIERREZ-FERNANDEZ** was to be

stored.  Surveillance footage from outside **HORTA-MOLINA's** residence (Target Premises #1

– 278 East Street North, Suffield, CT) was reviewed and investigators found that that shortly

after the intercepted call a vehicle, which matched the description of one that ANDRADE-

GUZMAN has previously been seen driving, showed up at **HORTA-MOLINA's** home.  Two

males and one child were then seen exiting the vehicle and walking to the back of the property

where the chicken coop is located.  The individuals were then seen leaving in the vehicle a short

time later.

### VII.   EVIDENCE RELATING TO RAZON-MEJIA

29.     As discussed herein, **Octavio RAZON-MEJIA** is a member of the DTO, who has

distributed narcotics and collected narcotics proceeds on behalf of **HORTA-MOLINA**.

### A.   Seizure of a half-ounce of cocaine on February 6, 2022.

30.     On February 5th and 6th, investigators were monitoring a court-authorized wiretap

of Target Telephone 1, being utilized by Guillermo CAPETILLO-CERVANTES, who resides at

22J Pleasant Street, Enfield, CT.  Based on previous surveillance done at the location,

investigators were also aware that **Octavio RAZON-MEJIA** lived in an upstairs apartment in

the same unit, which was identified as 22H Pleasant Street (**Target Premises #3**).  During an

intercepted call on February 5th (session 1984), CAPETILLO-CERVANTES told **RAZON-**

**MEJIA** that he was looking to pick up "1/2 or a whole one" from **RAZON-MEJIA** in the

morning of February 6, 2022, to sell to another party, who he referred to as the "Guatemalan."

The following morning, on February 6, 2022, at approximately 8:19 a.m., CAPETILLO-

CERVANTES contacted **RAZON-MEJIA** and let him know that it would be "1/2" and told

RAZON-MEJIA to let him know when it is ready so he can go upstairs to grab it.  Based on the

conversation, it was the belief of investigators that they were speaking about 1/2 ounce of

cocaine that was later to be sold to the "Guatemalan."  At approximately 8:29 a.m., **RAZON-**

**MEJIA** (user of Target Telephone 2), texted CAPETILLO-CERVANTES asking him to come

up to his apartment (session 2047).  At approximately 8:32 a.m., TFO Chamberland observed

CAPETILLO-CERVANTES exit his apartment at 22J Pleasant Street and walk upstairs towards

22H Pleasant Street, Enfield, CT.  Shortly thereafter, approximately 8:33 a.m., TFO

Chamberland observed CAPETILLO-CERVANTES walk back down the stairs and enter his

apartment.

31.     Minutes later, CAPETILLO-CERVANTES was seen leaving his apartment in his

white Nissan sedan and traveling to Geissler's Supermarket located at 100 Bridge Street, East

Windsor, CT, where he picked up a second individual.  Shortly after arriving, the white Nissan

exited and traveled a short way to a gas station located at 163 Bridge St., East Windsor, CT.

CAPETILLO-CERVANTES exited the vehicle along with his passenger, who went inside and

made a purchase from the gas station mini-market.  The parties then got back into the car and

CAPETILLO-CERVANTES drove back to the Supermarket where he parked next to a red

Toyota sedan with CT license plate C106710.  The aforementioned license plate was queried

through a law enforcement database which returned to a 2006 Toyota Corolla registered to

Antonio Tzoc LLC.  A DMV query revealed that Antonio TZOC currently had a PRAWN

warrant originating from Enfield, CT.

32.     At approximately 9:16 a.m., Enfield Police Department Officer Steve Prior

effectuated a traffic stop of the red Toyota sedan.  The operator was identified as Antonio

TZOC-GUARCHAJ.  During the traffic stop, TZOC-GUARCHAJ was taken into custody on the

PRAWN warrant and a search was conducted, where Officer Prior located and seized a white

powdery and rock like substance consistent with cocaine.  The suspected cocaine was field tested

and tested presumptively positive for the presence of cocaine.  The cocaine was later weighed

and measured approximately 1/2 ounce.

### B.     Intercepted Communications on 3/19/2022

33.     During communications between **RAZON-MEJIA** and **HORTA-MOLINA** on

March 19, 2022 (session 85), **HORTA-MOLINA** asked **RAZON-MEJIA**, while referring to a

prior conversation, if **RAZON-MEJIA** had asked him for "the other shit" or "that?"  **RAZON-**

**MEJIA** advised that he had asked "for the other," but that **HORTA-MOLINA** never brought

him anything.  **HORTA-MOLINA** then apologized saying, "Oh fuck! I forgot. Because I just

opened one, Pacha . . . I'm sorry man."  **HORTA-MOLINA** then stated, "I'm here at home

dude."  To which, **RAZON-MEJIA** responded, "Can you pass by here?  Bring me one?"

**HORTA-MOLINA** explained that he could not leave the house because he was with his child

but invited **RAZON-MEJIA** to come to him and gave a description of the home.  **HORTA-**

**MOLINA** also indicated that his wife was not home so it was okay for **RAZON-MEJIA** to

come to the house.  **RAZON-MEJIA** responded that he would be over soon.

34.     Surveillance efforts were immediately mobilized following the intercepted communications and investigators observed **RAZON-MEJIA** drive directly to **HORTA-MOLINA's** residence, where he met briefly with **HORTA-MOLINA** in the driveway (never leaving his vehicle) and then left shortly thereafter. Officers were able to see **HORTA-MOLINA** reach into the driver's window but were not in a position to see what was passed. Surveillance continued to follow **RAZON-MEJIA** and saw him meet up with an unknown party to make a drug sale.  There were corresponding communications that were intercepted, where the buyer had reached out to **RAZON-MEJIA** and the parties arranged to meet at the location where the sale was surveilled (session 86).

**D.     Additional intercepts from RAZON-MEJIA**

35.     During the period that his phone (Target Telephone 2) was subject to a court-authorized wiretap, investigators intercepted frequent communications to and from **RAZON-MEJIA** regarding narcotics transactions.  In the days that followed his meeting with **HORTA-MOLINA** from March 19th to April 6th, **RAZON-MEJIA** is believed to have made a minimum of twenty-five (25) distinct drug transactions, which were coordinated over **Target Telephone 2**. On some occasions **RAZON-MEJIA** directed the buyers to come to his home at 22H Pleasant Street.  For example, on March 20, 2022, **RAZON-MEJIA** engaged in a series of text messages from an unidentified party, which was entirely in Spanish, and translated by a certified Spanish-speaking monitor.  The first text read, "Cousin (buddy) give me one of that."  **RAZON-MEJIA** responded "Cousin (buddy) I'm sleepless; can't drive. Do you want to come to Enfield or I'll see you tomorrow in the afternoon." The unidentified party responded, "I'll pick it up" and "text me the address.  **RAZON-MEJIA** responded by texting the address: "22 Pleasant Street apt j Enfield ct 06082."  Following this text, there is a text between Guillermo CAPETILLO-

19

CERVANTES (who resides in Apt. J, which is belong Apt. H) and **RAZON-MEJIA** where CAPETILLO-CERVANTES says that **RAZON-MEJIA** already told him that "he will come to see me but didn't say in how long." CAPETILLO-CERVANTES advises that he will  "let [**RAZON-MEJIA**] know when we are coming up." After thirty minutes, **RAZON-MEJIA** texted, "Coming?" and the party said they would be there in thirty minutes.  Approximately thirty minutes later, the party texted, "Cousin(buddy) I'm outside."  On March 23, 2022, RAZON-MEJIA receives a series of text messages from UM6488.  The first text, as translated, indicated, "Partner I'm going to swing by your house."  UM6488 then texted, "In 10 minutes. I'm going to take one like the other day," to which RAZON-MEJIA responded, "okay." Likewise, on March 26, 2022, there was an intercepted call where RAZON-MEJIA directed a buyer to his residence.  Specifically, in session 257, UM0910 called RAZON-MEJIA and the following exchange took place:

> UM: Is that i have a fucking bad habit... right bro?
>
> RAZON-MEJIA: Mmm.
>
> UM: Yes. [Voices Overlap]
>
> RAZON-MEJIA: What did you want? What? One (1)?
>
> UM: Yes, yes, yes dude. I pass by now.
>
> RAZON-MEJIA: Alright then. Are you passing by here? [Voices Overlaps]
>
> UM: I'll get there soon. [Voices Overlap]
>
> RAZON-MEJIA: Alright then. In how long?
>
> [Background: Child talks]
>
> UM: Oh well dude. l'm going, I'm going over [U/I] In about 5 minutes. 5 minutes. [Voices Overlap]
>
> RAZON-MEJIA: Alright then.

36.     On other occasions **RAZON-MEJIA** would go meet customers, such as on March 28th.  On that date, a buyer asked **RAZON-MEJIA,** "Pachitas, where are you? Is there candy?" and **RAZON-MEJIA** responded, "here where you came last time."  The conversation then continued as follows:

> UM7447: OK
>
> RAZON-MEJIA:  Do you need something
>
> UM7447:  I will call you later, I am home
>
> UM7447:  Yes 100 can you take it to Candido
>
> RAZON-MEJIA:  I don't know who that is
>
> UM7447:  To his house and I will send you the money with Luis
>
> RAZON-MEJIA:  I don't know where he lives
>
> UM7447:  My father in law's house
>
> UM7447:  Leave it in the trash can
>
> UM7447:  Trash bottom
>
> UM7447:  I will go later
>
> UM7447:  Please
>
> RAZON-MEJIA:  But which apartment the first or the second
>
> UM7447:  The trash is in the parking next to the tree
>
> RAZON-MEJIA:  O okay hopefully no one sees
>
> UM7447:  In the bottom of the first can
>
> RAZON-MEJIA:  Okay I will go in like 20 minutes

37.     Additionally, on March 21st, **RAZON-MEJIA** called CAPETILLO-CERVANTES and asked him if he has any "cut," which was indicative that he had drugs that he

was processing for sale.  CAPETILLO-CERVANTES apologized that he did not have any, he

had planned on getting some but did not end up doing so.  Narcotics traffickers commonly use

various products as cutting agents to "cut" the narcotics being sold.  This process increases the

overall volume by adding another substance to the narcotics, which allows the traffickers to sell

more product and in turn make more profit.

      38.     On March 25, 2022, there was an intercepted call with Unidentified Male

UM0910 the relevant portion of the call is set forth below:

          RAZON-MEJIA: Hello.

          UM: Pachas!

          RAZON-MEJIA: Hey.

          UM: Buddy, how are you?

          RAZON-MEJIA: Good. You?

          UM: Hurricane winds.

          RAZON-MEJIA: Alright, alright.

          UM: Hey, dude!

          RAZON-MEJIA: Hey?

          UM: Can you make, can you make 60 [ph] balls, dude?

          RAZON-MEJIA: Uh, Well I'm in Springfield right now.

          UM: Oh, oh yes you're... Are you in Springfield?

          RAZON-MEJIA: Yeah.

          UM: Alright.

          RAZON-MEJIA: When I get back; I think.

          UM: What time you get back [ph] [U/I] [Voices Overlaps]

RAZON-MEJIA: I'll call you later once I get back. [Voices Overlap]

Investigators believe based on the totality of the conversation that UM0910 was requesting narcotics from **RAZON-MEJIA**. **RAZON-MEJIA** placed another call to UM0910, session 231, approximately 30 minutes later. In that call UM0910 says, "What's up? Are you home already?" **RAZON-MEJIA** responded that he is back in Enfield and asked, "Do you want me to pass by there?" UM0910 responded, "Okay. Yes, dude, yes. Yes due yes. I will wait for you here."

**VIII.   EVIDENCE RELATING TO CARLOS GUTIERREZ-FERNANDEZ**

39.    As previously discussed, **Carlos GUTIERREZ-FERNANDEZ**, aka "Shaggy" is a member of the HORTA-MOLINA DTO, who was arrested by Enfield Police on April 27, 2022, while transporting approximately one kilogram of cocaine/fentanyl on behalf of **HORTA-MOLINA**. During this investigation, investigators intercepted communications during which **GUTIERREZ-FERNANDEZ** discussed and arranged to meet "Juanito" to obtain the narcotics and then bring them to **HORTA-MOLINA's** residence.

**A.    Intercepted communication on 4/26/2022 and 4/27/2022.**

40.    During communications between **GUTIERREZ-FERNANDEZ** and **HORTA-MOLINA** on April 26, 2022, (session 119), **HORTA-MOLINA** stated that "Juanito" has something at his house that he wants to give to **GUTIERREZ-FERNANDEZ**. **HORTA-MOLINA** advised that "Juanito" had to work early, around 7:00 a.m., and that **GUTIERREZ-FERNANDEZ** should meet with "Juanito" before then. **HORTA-MOLINA** requested that **GUTIERREZ-FERNANDEZ** store the item for a little while before bringing it over to his house. **GUTIERREZ-FERNANDEZ** agreed to the request and stated he will coordinate with "Juanito." The next morning (session 120), **HORTA-MOLINA** called **GUTIERREZ-**

23

FERNANDEZ to discuss having **GUTIERREZ-FERNANDEZ** bring the item over to **HORTA-MOLINA's** home.  **GUTIERREZ-FERNANDEZ** states that he will take it over on his bicycle and confirmed that he already had the item in his backpack.  **HORTA-MOLINA** stated that **GUTIERREZ-FERNANDEZ** should leave it by the chicken food.  **GUTIERREZ-FERNANDEZ** affirmed and stated that he "already knows how to do it" and to use the sheets as covers.

### B.    Surveillance of GUTIERREZ-FERNANDEZ on 4/27/2022.

41.    As previously discussed, on April 27, 2022, **GUTIERREZ-FERNANDEZ** was continuously surveilled from the time he left his residence, at approximately 6:35 a.m., until the time that he was stopped and arrested.  During that time investigators observed him walking towards Molina's Plaza, where he was met by a Dodge Nitro.  He got in the car, did loop of the block and got out at Molina's Plaza.  He then went, with the gray backpack, and entered a door that was part of the commercial building in the plaza.  All of which was consistent with the plan that had been laid out over the phone with **HORTA-MOLINA**.   At approximately 6:54 a.m., **GUTIERREZ-FERNANDEZ** was seen exiting the same door with a lawn mower, weedwacker and other landscaping tools and proceeded to cut grass in the plaza for hours.   It was during this time period that **GUTIERREZ-FERNANDEZ** received the aforementioned call from **HORTA-MOLINA** checking on his status.  The call, which occurred at approximately 7:42a.m., consisted of **HORTA-MOLINA** asking if "everything was good" and **GUTIERREZ-FERNANDEZ** assuring him that everything was fine and that he had already put "it" in his backpack and indicated that he planned to ride over on his bicycle.  On this call, **HORTA MOLINA** also told **GUTIERREZ-FERNANDEZ** not to go to the front because his (**HORTA MOLINA's**) woman is there and instead directed him to go to the back where the chickens are located and put "it"

with the chicken food.  **GUTIERREZ-FERNANDEZ** reassured him that it would be done and then continued with his landscaping tasks until approximately 11:07 a.m.  At that time, he was observed carrying the gray backpack seen previously and taking a bicycle out from the storage/utility room.  Moments later **GUTIERREZ-FERNANDEZ** rode off on his bicycle.  As indicated he was subsequently stopped by police and during the interaction officers noticed the kilogram sized package that ultimately tested positive for cocaine and fentanyl.

## IX.  INFORMATION ON TARGET PREMISES #2

42.     As mentioned above, **Target Premises #2 – 17 Russell St., Enfield, CT** is a suspected stash location for this DTO.  Through physical surveillance, pole camera footage and intercepted communications this location has been identified as such.

43.     An intercepted communication on February 10, 2022, between CAPETILLO-CERVANTES and **RAZON-MEJIA** revealed that **RAZON-MEJIA** needed to travel to **Target Premises #2** to collect the requested product.  On that particular occasion, in summary, CAPETILLO-CERVANTES asked for **RAZON-MEJIA** for "one."  **RAZON-MEJIA** responded that he needed to see if he could put it together or if he has to "go up there." CAPETILLO-CERVANTES suggested that he needed the product now and **RAZON-MEJIA** responded, "Okay, let me check.  If not, I'll go over there now.  Okay?"  **RAZON-MEJIA** again stated that he will see "if he can put it together here," which investigators believe to be his apartment in Unit H, and that if not, he will have to go to a secondary location to retrieve the quantity of narcotics.  Investigators were able to observe **RAZON-MEJIA** leave the apartment a short time after this telephone call and drive to 17 Russell St., Enfield, CT.  **RAZON-MEJIA** stayed only a short time there before walking out of the apartment with something wrapped in a jacket, which he placed in the trunk of his car.  **RAZON-MEJIA** was then seen returning to

Pleasant Street, where he removed a bucket from his trunk and carried it upstairs to his apartment.  Shortly thereafter,  RAZON-MEJIA texted Guillermo CAPETILLO-CERVANTES, which as translated, read "they are ready."

44.     On April 1, 2022, at approximately 4:00 a.m., Enfield Police attempted to stop a vehicle in the area of Pleasant Street in Enfield, CT.  At that time the vehicle fled from police, northbound on Interstate 91.  A short time later that same vehicle came back into Enfield and stopped in front of 17 Russell Street.  Police made contact with the driver of the vehicle, and a passenger who had entered 17 Russell St.  The driver of the vehicle was arrested for motor vehicle violations, and the passenger was let go.   On that same morning, at approximately 4:32 a.m., a text message was intercepted that was sent to **RAZON-MEJIA** (who resides at 22H Pleasant Street) from someone named "Lisa".  The text messages, that were transcribed by a DEA Monitor, who is a Native Spanish speaker, is transcribed below:

> LISA: "The police keeps going to the yard behind the house with evidence bags. Are you sure you'll don't have anything hidden here in my property????  Pachas, tell me the truth.  Because if they find something; I will also have problems."

> RAZON-MEJIA:  Lisa, I don't have anything.

Investigators believe this text message to be in reference to the police activity that was happening at 17 Russell St. around that same time.  It is believed, based on investigators training and experience, and the overall scope of the investigation, that Lisa reached out to RAZON-MEJIA, at 4:30 a.m., because she was aware that he was using 17 Russell Street to further his drug trafficking activities.   (There have been no other calls, texts, or meetings observed during surveillance to suggest that "Lisa" is in any way involved in the DTO, and, thus, is unlikely to be someone that RAZON-MEJIA would confide in if he did have contraband present on April 1st.)

45.     On the date that the kilogram of cocaine was intercepted (4/27/2022), surveillance

units observed (in person and through a pole camera) that the operator of the Dodge Nitro that

met up with **GUTIERREZ-FERNANDEZ** had exited 17 Russell Street.  When the male exited

he was holding a small package or bag in his left hand.  The Dodge Nitro was then seen on

surveillance driving very slowly and several times pulling to the curb on its way to the area of

North Main St.  Surveillance units then observed **GUTIERREZ-FERNANDEZ** get into this

vehicle, before being dropped off at Molina's Plaza.  **GUTIERREZ-FERNANDEZ** then exited

the vehicle with his backpack, and the Nitro left towards Elm St.  **GUTIERREZ-FERNANDEZ**

later spoke to **HORTA-MOLINA** and confirmed that he had acquired the item that he was

supposed to get from "Juanito."

46.     In the days leading up to the April 27th seizure of the kilogram of cocaine/fentanyl

there were multiple intercepted communications between **HORTA-MOLINA** and an

unidentified male where there was discussion about **HORTA-MOLINA** waiting for a package

to arrive and it was clear from the discussion that it was not coming to his residence but rather to

an alternate address.  Knowing that a package was set to arrive, investigators monitored pole

camera footage outside of 17 Russell Street to see if that was the location where the package

would come as this was a location that investigators believed that the DTO was using as a stash

location and is a location where multiple members of the DTO had been surveilled.  Pole camera

footage revealed that a package from Fedex was delivered to 17 Russell Street, Enfield, CT on

4/26/2022, the day before "Juanito" met with **GUTIERREZ-FERNANDEZ**.

## X.     TARGET PREMISES

47.     Based on the foregoing facts, I believe that the **Target Premises** are all locations

which contain evidence, fruits and/or instrumentalities of the drug trafficking activities of

members of this drug trafficking organization.  From my training and experience and that of others agents participating in this investigation, I know that these residences and stash locations often contain other indicia of drug trafficking, including records of drug trafficking activity such as ledgers showing quantities provided and monies owed, drug paraphernalia such as scales and packaging material, telephones used by members of this DTO, associates' telephone numbers and locations, and records of travel in connection with drug trafficking activity.  In this particular case, I believe that such fruits, instrumentalities and/or evidence of the targets' conspiracy to distribute and distribution of controlled substances will be present in **Target Premises #1, #2 and #3.**

48. Based upon the totality of the facts and circumstances set forth herein, and based on my training and experience and consultations with fellow law enforcement officers, I know:

(a) that narcotics traffickers must maintain on hand U.S. currency in order to maintain and finance their on-going narcotics business;

(b) that narcotics traffickers maintain books, records, receipts, notes, ledgers, money orders and other papers relating to the transportation, receipts, sale and distribution of controlled substances.  That the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where traffickers have ready access to them -- frequently at their residences and stash houses, including in the garages at those locations;

(c) that persons involved in narcotics trafficking conceal in their residences and stash houses, including garages, caches of drugs, scales, drug packaging materials, cutting agents and diluents, large amounts of currency, financial instruments, precious metals, jewelry and other items of value and/or proceeds of drug transactions; and the evidence of financial

transactions relating to obtaining, transferring, secreting or spending of sums of money made from narcotics trafficking activities;

(d)     that it is common for narcotic traffickers to hide contraband, proceeds of drug sales and records of drug transactions in secure locations within their residences and stash houses, including attached and detached garages, for ready access and for concealment of these items from law enforcement authorities;

(e)     that narcotic traffickers commonly maintain addresses or telephone numbers in books, papers, cellular telephones or electronic organizers which reflect names, addresses and/or telephone numbers of their clients and associates in the drug trafficking organization.  Traffickers also maintain photographs and videotapes of participants and associates in narcotic trafficking activity, and property acquired as a consequence of narcotics trafficking activities; and

(f)     that narcotic traffickers commonly have in their possession, or at their residences, including in garages at those residences, firearms or other weapons that are used to protect and secure a drug trafficker's property.

49.     Based on the aforementioned information, I believe there is probable cause that fruits, instrumentalities and/or evidence of violations of Title 21, United States Code, Sections 841(a)(1) and 846 (possession with intent to distribute controlled substances and conspiracy to distribute controlled substances), will be located at **Target Premises #1, Target Premises #2,** and **Target Premises #3**, including records and notations reflecting the receipt, distribution and sale of controlled substances, such as receipts, ledgers, notebooks and records of customers, customers' telephone numbers and addresses, and sources of supply, documents bearing the names of the purported addressee and/or the residents, documents reflecting travel, such as

passports, visas, credit receipts for interstate and/or foreign travel, paraphernalia used to weigh and package narcotics for distribution such as scales and plastic bags, and other items more specifically set forth in Attachment A to the search and seizure warrant.  Accordingly, I request that search warrants be issued for each of **Target Premises #1, #2** and **#3**.

## XI.   CONCLUSION

50.     Based on the aforementioned information, there is probable cause to believe and I do believe that during the period set forth above, **Sergio HORTA-MOLINA**, **Octavio RAZON-MEJIA** ("Pachas"), and **Carlos GUTIERREZ-FERNANDEZ** ("Shaggy") conspired to possess with intent to distribute and to distribute controlled substances, in violation of 21 U.S.C. §§ 846 and 841(a)(1), and possessed with intent to distribute and distributed controlled substances, in violation of 21 U.S.C. § 841(a)(1).  Accordingly, I request that criminal complaints and arrest warrants be issued for each of these individuals.

51.     There is also probable cause to believe, and I do believe, that the items described in Attachment A, which are fruits, instrumentalities and evidence of these crimes will be found at **Target Premises #1, #2,** and **#3**.  Accordingly, I request the issuance of search warrants for **Target Premises #1, #2,** and **#3**, as discussed herein.

52.     Because this is an application that pertains to an ongoing criminal investigation, and because disclosure of the information contained herein as well as disclosure of the warrants and complaints being requested herein may compromise the investigation and increase the risk of harm for the law enforcement officers responsible for conducting the arrests and searches, I request that the warrants, applications, complaints and this affidavit be ordered sealed by the Court, until further order of the Court.

KIMBERLY
LADYGA

Digitally signed by KIMBERLY
LADYGA
Date: 2022.05.04 21:06:08
-04'00'

Kimberly Ladyga
Special Agent, DEA

Subscribed and sworn to before me
this 4th                day of May
2022, at Hartford, Connecticut.

Date: 2022.05.04
21:35:29 -04'00'

HON. THOMAS O. FARRISH
UNITED STATES MAGISTRATE JUDGE

31

## ATTACHMENT A
### (Items to be Seized)

1.   Books, records, receipts, notes, ledgers, and other papers relating to the distribution and transportation of controlled substances;

2.   Personal books, papers and photographs reflecting identities, names, addresses, telephone numbers, and other contact or identification data relating to the transportation and distribution of controlled substances

3.   Cash, currency, and records relating to income and expenditures of money and wealth, to wit: money orders, wire transfers, cashier's checks, receipts, bank statements, passbooks, checkbooks, checkbook registers, safety deposit box rental agreements and safety deposit box keys, as well as jewelry, precious metals and gems such as gold, silver, diamonds;

4.   Items of personal property that tend to identify the person(s) who own, occupy, control, or own the premises that is the subject of this warrant, including but not limited to mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys;

5.   Records of the accumulation of assets, such as ledgers, diaries, balance sheets and financial statements reflecting assets and liabilities;

6.   Evidence of expenditures for personal living expenses, such as invoices and receipts reflecting purchases for travel, vehicle rentals, food, clothing, entertainment, jewelry, household rent and utilities,

7.   Bank records, including monthly statements, canceled checks, and deposit and withdrawal forms and receipts,

8.   contraband, quantities of narcotics, scales, cutting agents and diluents and drug packaging materials;

9.   firearms, ammunition and other weapons; and

10.  safes and other secure storage containers and their contents.